Good morning and may it please the court. My name is Karen Swigert from Dillon Law Group and I'm appearing on behalf of Appellant Roban O'Hanley. I'd like to reserve three minutes for rebuttal. When evaluating a 12B6 motion, the court must presume all factual allegations of the complaint are true and draw all reasonable inferences in favor of the non-moving party. Here, the court neither presumed O'Hanley's allegations in his complaint were true, nor did the court give him the reasonable inferences that drew from those conclusions in his allegations. In the district court opinion, the court says Mr. O'Hanley incorrectly characterized his tweet that, quote, election fraud is rampant nationwide and we all know California is one of the culprits, close quote, as personal opinion. How is that not a statement of fact? How is the tweet about being rampant fraud? Yeah. Rampant is a term that is not defined. So Rogan O'Hanley did not suggest that there were five cases of election fraud in California or a certain number. It's not something that'd be quantified. So therefore, when you look at a tweet like that, it's suggesting that there's more than one or growing. So there's no way, unless the state were to go and find that there were... So if I say election fraud against Republican voters is rampant nationwide, you say that's protected opinion? That would be protected opinion. What if I add, so registered Republicans shouldn't bother to vote? Is that still protected opinion? I think it would be protected opinion. Isn't it at least misleading to Republican voters? It certainly, it would be misleading. Counsel, I have a different question. Has your client's account been reactivated under new management? It has not to date, Your Honor. And my other question to you, though, is about the allegations of state action. As I understand it, the California law in question that creates this opportunity to point out problems to Twitter and others, there's no enforcement mechanism in the statute. Am I right about that? There is no enforcement mechanism in the statute. So how is this anything other than a piece of information or a recommendation that a private entity can take or leave? Because the private entity, we have alleged, was not taking or leaving it. Well, but they chose. I mean, I may be, you know, thrilled to get my daughter's recommendations on books to read. I may read every single one of them, but so what? I don't really understand why the fact that there's recommendations are taken or suggestions are taken creates state action. So here, what we've alleged in the complaint is that these were not just recommendations, that these were more akin to directives and also rubber stamping on behalf of Twitter. But how can they be directives if there's no way for the State to enforce them? They're suggestions. There doesn't have to be an enforcement mechanism for there to be joint action. If you look at the court's prior opinion in Sutton v. Providence Medical Center, the court goes through several examples of what joint action would rise to the level of there being a sufficient nexus for state action. And it's also important to remember, we're at a motion to dismiss stage here. So the only thing that's required is plausible allegations. We don't have discovery. We have some of the background information because of public records requests, but there's a lot that we don't know. The only thing that's required at this point is plausible allegations. And if you look at the allegations that we have in our complaint, there was prior evidence that when the parties said they were flagging a tweet, it was a direct request to censor speech. We have a 98% takedown rate. So 98% of the time, the State requested Twitter takedown speech or censor speech. They did so at the State request. There's a plausible inference that can be drawn from that, that this was not Twitter enforcing its own content policies, but instead just rubber stamping the State. But they do have content policies that forbid the sorts of misleading or inaccurate statements that are involved. I would say that this was not one of those. Do they have such a policy? They have the content moderation policies that were in place at that time. If you look at the language of them, they were in regards to speech that would have been before an election. So specifically, there were content moderation policies that talked about speech that might cause someone not to vote, as the court suggested earlier, or speech that may tell someone the wrong voting location. This was after the fact. Election day had already happened. There was no chance that it was going to impact election day turnout. You analogize Twitter to a shopping mall, shopping center. You say, like a shopping center, it's open to all members of the public. But that's not true, is it? Are Russian intelligence agents members of the public? They are members of the public. Is it open to Russian intelligence agents? Shopping centers are, and Twitter would be as well. Anyone can sign up on Twitter. So if a Russian intelligence agent meets a CIA defector in a shopping center and they're both arrested by the FBI, you consider that still open to them? Well, there are consequences that come from that as a criminal matter. So like a newspaper, doesn't Twitter have the right to refuse to publish anything at once? Newspapers, I believe the court is alluding to the Miami Herald case. One of the things about newspapers is that there is a limited amount of space in newspapers. The particular statute that was at issue there, the state— Really? Are you not aware that newspapers have their own websites? They do, but when that case was decided, Your Honor, it was— So is it not directly analogous today? Are you saying that the New York Times can no longer refuse to publish letters to the editor because they put them online? No, there's other things that would make it onerous for a newspaper to do so. There's editing that's required. There's other constraints on speech that come with a newspaper publishing something. There is other controls that come with that. Twitter is a place where it's open for all voices. So anyone can sign up. They start speaking, and there's not a limitation on the amount of speech that goes on on Twitter. What percentage of the Twitter users are bots? That's not in the record, Your Honor. I understand. Can Twitter block messages from bots? As part of their content moderation policies, I believe they are. But you agree they can. They can. As a matter of law. As a matter of law, they can. So how is it different to be able to block one user and not another? This is a case where the state requested Twitter to censor speech. They were working jointly. We're talking about Twitter policies. So Twitter does have rights to do so. When Twitter jumped into bed with the state, so to speak, they gave up some of those rights that they would normally have. That's what happens when you become a state actor. Twitter does have speech rights to be able to speak. They have rights as content moderators to be able to enforce their policies. But what they did here was different because they jointly acted with the state to do something that the state couldn't do on its own. The state could not go and censor speech on its own. That's a clear violation of the First Amendment. What they did was they got Twitter to do its dirty work. Supposing the United States says that Soviet military intelligence, the GRU, is using bots to affect U.S. election and they put that notice out. Does Twitter and every other site have the right to simply block those bots? That is, and that's a different situation than what we're dealing with here. They haven't ordered them to do it. Is there any kind of government coercion? No, but government coercion is not necessary under the joint action test. Okay, is there any kind of government cooperation? Yes, there is government cooperation. Because they've made a fact known? Well, here we're not dealing with the government just making a general pronouncement about election misinformation. They made a specific request to Twitter to censor Rogan O'Hanley's speech. Where on the record did they say, censor this speech? They flagged the tweet and we have shown that, we have both alleged and shown in prior communications that flag was a euphemism that the parties used to take down speech. And so that censorship was... You're saying that the state of California flagged? Flagged the tweet to Twitter through a portal that they created specifically for that purpose. They simply pointed out its existence. They pointed out its existence and flagged it to them. And as they did 98% of the time, Twitter moved to take down that speech. Just so I'm clear on your argument, you're saying that the tweet at issue here that your client sent is not in violation of any then existing Twitter content moderation policy? I don't believe it is, Your Honor, no. If you look at it, it is a statement of pure opinion. It's not something that... If you look at the defamation standard, defamation standard is something that can be proven true or false. This is not a statement that can be proven true or false. I thought the policy also covered misleading information. And if you suggested that fraud was rampant, I think that typically means widespread. And it, in fact, was not. Wouldn't that be at least misleading, even if not provably false? I think that the definition of rampant that we provided in our briefing, it said that it was growing, is my understanding of the word rampant. And so if you say that something is growing, it's not necessarily an overall prediction of size. Is that the only usage in the dictionary? I don't know if it's the only usage in the dictionary. That's not the most common understanding of the term, just in real life. Could be, I think. I can only point to... Did you research that question? I did not. I looked at the dictionary. Honestly, Your Honor, I don't remember looking at that part of it within the dictionary. All right. Can I ask you a question about the injunctive relief you're seeking against the lone State defendant that's left? Because it's just Secretary Weber, is that right? Correct. I mean, I think the district court said you didn't have standing. And I guess I'm just wondering maybe more from a redressability standpoint. If your client hasn't been reinstated to Twitter, what is it exactly that you would get from, in terms of injunctive relief against the Secretary now that would be of any use to your client, frankly? Injunctive relief that we would be seeking was that the State not do this in the future. Do what? To... Flag tweets? Because he's not... He's not tweeting. He's not. But they could. There are other social media platforms that the State utilized. There are other social media platforms that my client utilizes. So in the future, it would be that the State not take acts to censor my client's speech. And to be clear, my client is not asking for injunctive relief against Twitter in terms of reinstatement. That's not something that he's requested. Is he still up on other, you indicated, other forms of social media? He is still on other social media, Your Honor. Does he still make a living or whatever it was he was doing as an influencer? He does as a social media influencer. His business has been impacted, certainly, as Twitter is the primary place for political speech in the United States to happen on social media, but he is still making his living in this regard. If Twitter went out of business, would he still be able to function? I think he would be able to function, but it does diminish his capacity to be able to make a living. Okay. Do you want to save the rest of your time for rebuttal? Yes. Thank you, Your Honor. Very good. Let's hear from counsel for... Well, who's going first for Twitter? Very good. Ari Holzblatt for Appalachia Twitter. I believe we've split the time, so I'll take eight minutes, and counsel for the Secretary will take seven. Okay. Your Honors, to preserve a robust sphere of individual liberty, the test for transforming a private defendant into a state actor is extremely demanding, especially whereas here the private defendant was exercising its own First Amendment rights. Let me ask you a question, counsel. Yes. One of the things Mr. O'Hanley said was when your country is stolen and you aren't even allowed to talk about it, that's not freedom, it's fascism. How can that be a misstatement of fact? Your Honor, I don't believe there's anything in the Twitter civic integrity policy that requires there to be a statement of fact. The Twitter civic integrity policy is in the record at ER 307, and it provides that disputed claims that could undermine faith in the process itself, including unverified information about election rigging, ballot tampering, vote tallying, or certification of election results, could violate the policy. And Twitter announced in the aftermath of the violent attack on the Capitol on January 6th that it was going to aggressively increase enforcement of that policy. I believe the tweet that your Honor is referring to is one that was tweeted in and around the inauguration. That was a time when Twitter had determined that there was a concern with tweets of this sort. But supposing instead of that, he had just posted a quote from Edmund Burke, saying all that is required is for good men to do nothing. Would that have been deleted and flagged as well? Well, I can't tell you whether it would have been deleted or flagged, but what I can say is that the particular tweet your Honor is referring to, there is no allegation of any communication from the Secretary to Twitter in connection with that tweet. It was a tweet that was issued in the midst of a particular moment in time when Twitter had announced that it was aggressively increasing enforcement of its policy. And Twitter is, as your Honors have repeatedly said, wholly free under its user agreement and under the First Amendment to make its own editorial judgments about the speech that it wishes to disseminate through its platform. It made those particular judgments with respect to Mr. O'Hanley here. And you'll say the same thing about the photo of the Capitol with the most votes in American history as well. That's correct, your Honor, and I think it bears emphasis.  Twitter is entitled as a First Amendment actor and as someone who has a user agreement with its users, which give it the right. In fact, the user agreement gives Twitter the right to remove content for any or no reason, including for violations of its rules. Twitter, and the only issue in this case is whether Twitter somehow, as counsel for the appellant said, gave up its rights because of a communication. Now, we're talking about a single one-way communication in November that preceded by a month and a half or three months the tweets that your Honor is referring to and the permanent suspension decision. Now, there are a couple points that were just made that I wanted to address, if your Honors will permit me. The first is whether the policy applies only before an election. It obviously does not. The record contains the policy, which, as I just quoted for your Honors, specifically refers to disputed claims about vote tallying, which necessarily happens after the election. Obviously, Twitter was concerned at the time about casting doubts on the faith of the electoral process, and then in January it announced it was going to increase enforcement of that process. Judge Gruber, it looked like you might have been, no, okay. Just thinking. I'm sorry, your Honor. Judge Gruber, you also pointed out that, of course, the government is free to persuade private actors to act on the basis of their views. That doesn't transform them into state actors. This Court emphasized that in the Zoo v. Breed decision, where the mayor of San Francisco urged a billboard operator to remove a particular billboard, and the billboard operator did. The fact that the billboard operator was persuaded did not transform the billboard operator into a state actor. Similarly cited in Zoo v. Breed, the American Family Association case, and I think that addresses Appellant's point about the 98 percent figure. Now, first of all, it's in the record, Exhibit 9, to the complaint, which is Excerpts of Record 451, that Twitter indeed routinely removed rejected flags that had come from the Secretary. But the fact that Twitter, the views of the Secretary landed well with Twitter, just as the recommendations of your daughter for books might land well with you, your Honor, doesn't transform Twitter into a state actor, and Twitter is free to choose the government as a credible source of information. Or not. Or not, and that is Twitter's right to do so. I think it might be a different story if there were a pattern of Twitter acting on speech that actually didn't violate the content guidelines, right? Then I think you might be able to infer that, oh, well, there's something else going on here other than Twitter making its own independent determination that its own rules were being violated. And that's why I was pressing counsel for clarification. I think you've addressed that point. But is it your position that there is no evidence, at least in terms of what we have in the complaint, that there's a pattern of Twitter taking down speech or taking action against speech that actually falls outside the guidelines? Well, I think there would have to be a lot more than is alleged here. Even the pattern of behavior with respect to Mr. O'Hanley demonstrates that Twitter was enforcing its own rules. We have five tweets, only one communication from the Secretary, and the other four there's no allegation of communication. You have Twitter having established that policy by itself months before any allegation about Mr. O'Hanley and then taking action against Mr. O'Hanley a long time later. You have the context of the violent attack on the Capitol and Twitter announcing that it was, obviously, aggressively increasing. And I think it is the job of the court, and Judge Breyer, I believe, did that here under the plausibility standard, to weigh not just allegations that favor plaintiff's theory, but also take account of those that undermine plaintiff's theory and determine does that tend to exclude obvious alternative explanations. I believe that's all Judge Breyer did here. And unless the court has no further questions, I'll pass the baton to the Secretary. Okay. Very good. Thank you. Good morning. My name is Deputy Attorney General Anna Ferrari, joined by my colleague Paul Stein, on behalf of Secretary Weber. And may it please the court, I'd like to briefly address the deficiencies with Mr. O'Hanley's standing allegations and why the dismissal should be affirmed on standing grounds. Is he a citizen of California? Mr. O'Hanley? I believe he's a resident of Florida. The complaint, stripped of its hollow allegations of conspiracy and censorship by the government, ultimately attributes just one action to the Secretary. That one OEC employee sent one message to Twitter about one tweet. And the complaint concedes, as Your Honors have mentioned, that Twitter's decision to suspend O'Hanley's account was made independently, based on its own interpretation of its content moderation policies. And so any alleged harm that is caused by this suspension, which is the only type of harm alleged in the complaint, cannot be fairly traceable to the Secretary of State. I don't understand why standing, I mean, we obviously have to address standing, but it seems to me there is a causal chain you can trace. I mean, it might be that the state's actions here was just a catalyst, and, yeah, there were other things that had to happen after that, but if you were kind of the spark that lit the fire, I don't see a problem tracing causation. Respectfully, the Secretary would submit that that chain of causation is too attenuated to support standing. The idea that the Secretary, by flagging a tweet for review, somehow set the wheels in motion for Twitter to take content moderation actions on tweets that he posted months later in response to— But, I mean, what their response is is that we're also complaining just about the addition of the, what do you call it, when they put content on your, you know, this claim is disputed or something, right? And that did happen with respect to the very tweet that's before us. Maybe you say in a larger scheme of things that's a trivial injury, but that's what they're complaining of. Well, it's correct that a label was appended to the tweet, and that was the end of the transaction or the interaction as it pertains to the Secretary of State. The complaint alleges no harm from the appendage of that label. It does. It only alleges ultimate harms that flow from the suspension of his account, which are the— I'm sorry, I think he is complaining that that is a harm of constitutional dimension. He had a label slapped on his tweet that he doesn't think, you know, should have been fixed. And that's attributable to what your client's office did. With apologies. The harms alleged in the complaint are that Mr. O'Hanley lost access to his followers and that he lost revenue on account of not being able to post to Twitter. And none of that flows from the fact that a label is posted on one tweet indicating that it's disputed. It's far too attenuated to give rise to fair traceability. And as you correctly pointed out, there's a very serious question as to whether this harm could ever be redressed by the broad injunctive relief that Mr. O'Hanley is seeking against the Secretary. So we would submit that the case should be—the dismissal should be affirmed on standing grounds. Turning to state action, I'd like to ground this discussion in the specific requirements of LUGAR and of the state action precedents of this circuit. Out the gate, the complaint, in order to establish state action, needs to show that the conduct at issue by Twitter is caused by a right or privilege that's created by the state or a rule of conduct that's imposed by the state. And the complaint alleges no facts that would indicate that Twitter's ability to control what content is posted on its platform comes from a right or rule that's established by the state. It's a matter of private agreement between Twitter and its users. And nothing in Elections Code Section 10.5 changes Twitter's rights or responsibilities in that regard. Twitter's been applying its own content moderation rules since long before the enactment of Section 10.5. But our cases haven't really been that rigorous in always applying that first prong of the LUGAR test, right? We've often just skipped to the second prong and gone through each of those four tests. And that's what I think the plaintiff is advocating we do here. I think that's correct, that that's what the plaintiff is advocating for here. But either prong is dispositive. And so the fact that many cases turn on the application of the second prong in no way means the first prong isn't relevant. And I think perhaps the lack of opposition to the first prong is telling that it bars the application of state action to these alleged facts. The nexus theory also fails out the gate. The nexus theory applies when a private actor and a public actor have a uniquely close linkage at the organizational level, like a dependency on state funding or a shared executive leadership, like the two hospitals in the Rawson versus Recovery Innovations case, such that the decisions of one should be imputed to the other. And here there is no allegation that the Secretary of State is not just merely involved but dominates the decision-making of Twitter. And I think this is exemplified well by the portal, which is not, first of all, contrary to counsel's allegations, was not created by the Secretary of State or any elections official. It existed at Twitter as a means of accepting flags, and elections officials were invited later, given the importance of the type of content that they would be flagging. And Twitter is not run by these multitudes of civic officials who have access to the portal. So there is no plausible allegation that the nexus theory could apply. And then the joint action theory, I think, is squarely foreclosed by Doe versus Google, where this court held last month on very similar facts, that when public officials raise issues about content on social media platforms and encourage them to take action to combat the spread of misinformation, this does not convert later independent content moderation decisions into state action. You mentioned the portal, but what about that earlier email that they have allegations about? That did seem to be kind of outside the normal channels. It suggested a direct access to someone at Twitter who could take immediate action. There's a number of means to report tweets. It can be done by clicking on a button on a tweet itself. It can be done through the portal, and it can be done by email access. And they will all reach the same people at Twitter who are tasked with content moderation. And I'm not even sure that the complaint alleges which path that the Secretary of State's flag took. It's not in the record, but it wouldn't matter regardless. I'd like to briefly address the 98% takedown allegation. The Secretary is charged by law with ensuring free and fair elections and making sure that voters are educated about the value and security of their vote. And so it's entirely unsurprising that the Secretary can speak authoritatively about what constitutes election misinformation and the fact that there's a high degree of correlation between what the Secretary identifies as violative of Twitter's policy and what actually violates the policy. It speaks for itself. It in no way indicates that some level of collusion or collaboration was necessary to reach that result. And as Exhibit 9 to the complaint makes clear, Twitter was comfortable reaching its own independent judgment when it disagreed with the Secretary. Okay. All right. It doesn't look like my colleagues have any other questions for you, so thank you for your argument. We'll hear from counsel for the appellant. You have about two minutes, I think, for rebuttal. Yes. Thank you, Your Honor. I'll address quickly a few points that were made. No one thinks when there is a tweet on Twitter that it is Twitter's speech. This is an argument that Twitter has been making for years under Section 230, Prong 1, that when someone is speaking on Twitter, it is the speech of the person who is making the tweet, not Twitter's speech. So that doesn't hold water. If you look at the idea that this is a one-way communication. Wait, wait, wait. What doesn't hold water? That Twitter still doesn't, you're saying it doesn't have a First Amendment right there because it's not Twitter's speech? That the idea that Rogan O'Hanley's speech would be attributed to Twitter. Rogan O'Hanley's speech was attributed to Rogan. Yeah, yeah. This was not a one-off communication. This is something that over a year of coordination, the parties had worked out this system. So to view this in isolation does not give Rogan O'Hanley the plausible inferences that should be drawn from the record before the court. One of the other things to talk about, the harm alleged here with the initial strike was much more than just a pending commentary to it. They restricted the view of his tweet and people's ability to retweet it. So there was a direct censorship harm that came from that action. In the absence of your theory, I'll say, of state action, isn't that a right that Twitter has or that any other platform or newspaper has? In other words, even if the speech isn't attributable to them, for example, a newspaper selects which letters to publish and nobody thinks that they are signed by the newspaper, it's not an editorial, but don't they get to pick? They do get to pick. Okay, so there's nothing per se wrong with what Twitter has done. The only hook that you have is your theory that this is somehow hooked into a requirement or collusion with the state. Is that right? There are other things. So the Liberty of Speech Clause in California, I think, would say differently, this court, that it is broader than the First Amendment in terms of protecting speech when you have the equivalent of a public square. And seeing that my time is running short, I just wanted to end with one point, and that is the court dismissed this case with prejudice, not allowing Mr. O'Hanley to cure any defects. We are in an evolving situation. With Twitter's new ownership daily, things are coming out that show that there was a greater collusion than I think a lot of people knew. We fully expect that this evolving situation is going to reveal facts that would sure up any qualms the court has about plausible allegations in this case. And so at a minimum, we would ask— Is that in the record somewhere? I'm sorry, Your Honor? Is that in the record somewhere? It is not, Your Honor. Just what we're faced with right now. Thank you. Okay, thank you very much. The case just argued is submitted.
judges: GRABER, WATFORD, UNKNOWN